```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
XAVIAN INSURANCE COMPANY and XAVIAN      :
HOLDINGS, INC.,                          :
                                        :
                      Plaintiffs,        :    18cv8273(DLC)
                                        :
              -v-                        :    OPINION AND ORDER
                                        :
MARSH & McLENNAN COMPANIES, INC. and     :
MARSH USA, INC.,                         :
                                        :
                      Defendants.        :
                                        :
----------------------------------------X
```

APPEARANCES

For the plaintiffs:

Christopher J. Akin
Kent D. Krabill
John Volney
Michael Kalis
Paulette Miniter
2100 Ross Avenue
Suite 2700
Dallas, Texas 75201

Brandon DeMay
Holwell Shuster & Goldberg LLP
425 Lexington Avenue
New York, New York 10017

For the defendants:

Michael C. D'Agostino
Kimberley Elizabeth Lunetta
Morgan, Lewis & Bockius, LLP
101 Park Avenue
New York, New York 10178

David J. Levy
Morgan, Lewis & Bockius LLP
1000 Louisiana Street
Suite 4000
Houston, Texas 77002

Romeo S. Quinto, Jr.
Morgan, Lewis & Bockius LLP
77 W. Wacker Drive
Suite 500
Chicago, Illinois 60601

DENISE COTE, District Judge:

On January 16, 2019, defendants Marsh & McLennan Companies, Inc. ("MMC") and Marsh USA, Inc. ("Marsh") moved to dismiss the sole claim in the plaintiffs' Second Amended Complaint ("SAC") for failure to state a claim, pursuant to Rule 12(b)(6), Fed. R. Civ. P.  The SAC contains a single cause of action for misappropriation of trade secrets in violation of the Defend Trade Secrets Act of 2016 ("DTSA") 18 U.S.C. § 1836.  For the reasons that follow, that motion is granted in part.

## Background

The following facts are drawn from the SAC and are assumed to be true for the purpose of addressing this motion. Plaintiffs Xavian Insurance Company and Xavian Holdings, Inc. (collectively "Xavian") were formed in 2007 to explore a business model for private insurance for aircraft purchases by foreign airlines with poor credit ratings or other risks.[1]  Part of Xavian's business model involved obtaining a Single-A rating

---

[1] Until 2015, the Export-Import Bank of the United States ("Ex-Im") provided government-backed all-risk export credit guarantees to encourage lenders to finance commercial aircraft purchases by foreign airlines with poor credit ratings.

from U.S. credit rating agencies.  As became clear from Xavian's opposition to this motion to dismiss, Xavian asserts that this exploration resulted in the development of two trade secrets: (1) actuarial work that defined the loss for given default rates for foreign airlines with below investment grade credit, and (2) the ratings analysis for Xavian that would be used by credit agencies in the event that Xavian entered this private insurance business (the "Trade Secrets").[2]

The DTSA requires that the owner of a trade secret take reasonable measures to keep its trade secret in fact secret.  18 U.S.C. § 1839(3)(A).  Accordingly, the SAC describes the entities with whom Xavian shared its Trade Secrets and the terms under which it did so.

Guy Carpenter

Xavian entered into two agreements with Guy Carpenter ("Carpenter"), a Marsh subsidiary.  It is the second agreement which is of most importance to this motion.

In May 2009, Xavian entered into the first agreement, a Mutual Non-Circumvention and Non-Disclosure Agreement (the "Carpenter NDA").  The Carpenter NDA had a term of three years

---

[2] The SAC does not clearly identify the trade secrets at issue. In opposing the motion to dismiss, however, Xavian explained that it was not asserting that its idea of providing the all-risk insurance in this sector of the airline financing industry is the trade secret, but rather the two concrete pieces of data set forth above.

3

and gave Xavian the right to request within that term that Carpenter destroy all the information that it had received from Xavian.  The Carpenter NDA expired on May 13, 2012.  The SAC does not assert that Xavian ever asked Carpenter to destroy documents containing its Trade Secrets.

In August 2009, Carpenter and Xavian entered into an agreement for Carpenter to provide services through its "Instrat" division (the "Instrat Agreement").  That agreement provided:

> As between [Xavian] and [Carpenter], [Xavian] <u>owns</u> and shall retain <u>all rights</u>, title, and interest including, without limitation, all intellectual property rights, in and <u>to any and all data</u>, information, content, and other materials provided by [Xavian] and its consultants in connection with this Agreement (collectively, the "Client Materials") . . . . [Carpenter] agrees that any Client materials provided by [Xavian] to Carpenter under this Agreement <u>shall remain confidential</u> and shall not be disclosed by [Carpenter] to any third party without the prior written consent of [Xavian].

(Emphasis supplied.)  The Instrat Agreement also provided that Carpenter would "perform actuarial, financial, and/or catastrophic modeling services for [Xavian] in connection with [Carpenter's] provision of reinsurance intermediary services."  To assist Carpenter in performing its services under the Instrat Agreement, Xavian provided it with information including the Trade Secrets.

4

Carpenter and Marsh

Pursuant to the Instrat Agreement, in early 2010, Carpenter arranged a meeting between Xavian and Marsh executives to discuss the possibility of Marsh investing in Xavian or helping find other investors. In advance of that meeting, Xavian provided at least one of its Trade Secrets to a Carpenter executive.

On January 8, 2010, Xavian met with Norman Brown ("Brown"), who was a managing director for Carpenter's securities group. Xavian provided Brown with the ratings analysis Trade Secret. In an email also dated January 8, 2010, Xavian reminded Brown that the rating evaluation "is trade secrets and highly proprietary," and that "it should not be disclosed to anyone outside the Marsh family." Brown allegedly "confirmed to [Xavian] that he understood the obligation to maintain the confidentiality of Xavian's trade secrets." The rating evaluation was marked "Private and Confidential" at the bottom of each page.

Xavian also provided Marsh a copy of its business plan, which was marked "Confidential -- for Company Disclosure Only," and contained a section titled "Confidential Undertaking -- Must Read", under which the following text appears:

> This document contains business secrets, trade secrets, confidential information and proprietary data owned, licensed to or created by Xavian Holdings Inc.

5

> ("Xavian"). It is supplied exclusively to the reader
> with the express understanding that (A) <u>it shall be
> kept completely confidential, and</u> (B) <u>no portion</u> of
> the contents of this five year plan (the "Plan") <u>shall
> be disclosed to any person</u>, firm or entity that is not
> an employee of the reader, <u>except professionals who</u>
> have a need to know the material contained herein,
> receive it in a professional capacity, <u>agree in
> writing to keep it confidential</u>, and return it to the
> reader when such professional's work is completed.

(Emphasis supplied.) The SAC can be read as alleging that the Trade Secrets were included in attachments to this document.[3]

On February 3, 2010, Xavian and Carpenter representatives met with Marsh at Marsh's corporate headquarters. During that meeting, Marsh "asked several informed questions that demonstrated knowledge" of the information that Xavian had provided to Carpenter. The SAC does not indicate whether the questions demonstrated knowledge of the Trade Secrets.

<u>Xavian's Termination of the Instrat Agreement</u>

In September 2010, Xavian gave a 30-day notice of its intent to terminate the Instrat Agreement, as provided by the terms of the agreement. The Instrat Agreement's termination provision provides:

> This Agreement shall remain in effect until canceled
> by either party upon thirty (30) days prior written
> notice to the other party. However, <u>all the rights</u>,
> obligations, and duties set forth in this Agreement as
> to each party <u>shall remain in effect after termination</u>

---

[3] There is a studied ambiguity in many of the SAC's passages, due in part to the SAC's failure to crisply define its Trade Secrets.

>       with regard to any Output provided to the Client while
>       the Agreement was in effect.

(Emphasis supplied.) The Output protected by the termination provision refers to "any reports, analyses, and or other output generated by [Carpenter] using the Client Materials."

Stone Point

On March 9, 2011, Xavian met with Brown and Stone Point Capital, LLC ("Stone Point") to discuss Xavian's plans. Prior to that meeting, on February 2, 2011, Xavian had entered into a Mutual Non-Circumvention and Non-Disclosure Agreement with Stone Point (the "Stone Point NDA"), which applied to Stone Point's "employees, consultants, advisors, and debt financing sources." In an email sent by Xavian prior to that meeting, Brown is described as "an advisor to Stone Point." The Stone Point NDA provided: "This obligation of non-disclosure of information shall continue to exist for eighteen (18) months from the date hereof." The NDA therefore expired on August 2, 2012. Xavian alleges that it timely demanded the return or destruction of the documents that it shared, as provided for in the NDA. The SAC does not explain whether it ever provided the Trade Secrets to Stone Point or whether any documents containing disclosed Trade Secrets were returned.

Creation of AFIC

Xavian's business never got off the ground.  In June 2015, however, Ex-Im's congressional authorization lapsed and it ceased providing all-risk guarantees for commercial aircraft purchase financing.  Shortly before the demise of Ex-Im, Boeing Capital Corporation ("BCC") reached out to Xavian to ask if the plan it had previously discussed with BCC for a private alternative to Ex-Im was "resurrectable."  BCC never followed up with Xavian after this conversation.

Those prior discussions with BCC occurred between 2007 and 2011.  In 2007, Xavian had signed a Proprietary Information Agreement ("PIA") with BCC, which imposed broad confidentiality obligations with respect to proprietary information disclosed by either party, including trade secrets.  Pursuant to that agreement, Xavian engaged in a series of formal and informal conversations with BCC about its proposed business plan through 2009, and shared its Trade Secrets with BCC.  In 2011, after the PIA had expired, Xavian "had further discussions" with BCC that did not bear fruit.

In June 2017, Marsh and The Boeing Company ("Boeing") announced the formation of the Airline Finance Insurance Consortium ("AFIC"), a group of four large insurance companies offering an insurance-based guarantee similar to the one developed by Xavian.  The SAC alleges that Marsh and Boeing

8

could not have developed AFIC without using Xavian's proprietary Trade Secrets.

On September 11, 2018, Xavian commenced this action against Marsh and MMC, alleging that Marsh misappropriated Xavian's trade secrets in order to create AFIC. On the same day, Xavian filed a similar action against BCC and Boeing in the Northern District of Illinois. Xavian filed a first amended complaint ("FAC") on October 1, 2018. Marsh moved to dismiss that complaint on November 26, 2018 for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). On December 13, 2018, Xavian filed the SAC, thereby mooting the November 26 motion to dismiss. Marsh and MMC renewed their motion to dismiss on January 16, 2019. That motion became fully submitted on February 22.

## Discussion

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Sierra Club v. Con-Strux, LLC, 911 F.3d 85, 88 (2d Cir. 2018) (citation omitted). A claim to relief is plausible when the factual allegations in a complaint "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Progressive Credit Union v. City of New York, 889 F.3d 40, 48 (2d Cir. 2018) (citation omitted). "[T]hreadbare recitals of

9

the elements of a cause of action, supported by mere conclusory statements, do not suffice." Carlin v. Davidson Fink LLP, 852 F.3d 207, 212 (2d Cir. 2017). The plaintiff must plead enough facts to "nudge[] [his] claims across the line from conceivable to plausible . . . ." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

When a party moves to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), Fed. R. Civ. P., a court must "constru[e] the complaint liberally, accept[] all factual allegations as true, and draw[] all reasonable inferences in the plaintiff's favor." Coalition for Competitive Electricity, Dynergy Inc. v. Zibelman, 906 F.3d 41, 48-49 (2d Cir. 2018) (citation omitted). "A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 230 (2d Cir. 2016) (citation omitted). A court may also consider documents that are "integral to the complaint." Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016). "A document is integral to the complaint where the complaint relies heavily upon its terms and effect." Id. A court may consider "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit . . . ." Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000). A court may also take judicial

10

notice of "relevant matters of public record." Giraldo v. Kessler, 694 F.3d 161, 164 (2d Cir. 2012).

Marsh has moved to dismiss the SAC on the ground that the information Xavian seeks to protect is not a "trade secret" within the meaning of the DTSA and is therefore not entitled to protection under that statute. "The question of whether or not [information] is a trade secret is generally a question of fact." A.F.A. Tours, Inc. v. Whitchurch, 937 F.2d 82, 89 (2d Cir. 1991). In order to recover under the DTSA, however, Xavian must adequately plead that the information it seeks to protect qualifies as a "trade secret."

The Economic Espionage Act, which creates criminal liability for trade secret theft, was amended by the DTSA to create a federal civil cause of action for owners of misappropriated trade secrets. Pub. L. No. 114-153. The DTSA provides that information is a "trade secret" if

> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3). The DTSA uses the definition of "trade secrets" from the Economic Espionage Act. The statute does not provide further guidance on what constitutes "reasonable

11

measures" to keep the information secret, and the Second Circuit has not yet construed this statutory term.

The DTSA was intended to "create a uniform federal civil cause of action, without preempting state law, to provide clear rules and predictability for trade secret cases." 162 Cong. Rec. S1631-02, S1635 (daily ed. Apr. 4, 2016) (statement of Sen. Grassley). It "draws heavily from the Uniform Trade Secret Act" in order to "harmonize[] U.S. law." 161 Cong. Rec. S7249-01, S7251 (daily ed. Oct. 8, 2015) (statement of Sen. Coons).

The Uniform Trade Secrets Act ("UTSA") defines a trade secret as information that

> (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Unif. Trade Secrets Act § 1(4). "Efforts reasonable under the circumstances," does not appreciably differ from the DTSA's "reasonable measures" standard.

Legislative debates surrounding that DTSA emphasized that the "narrow definition of a trade secret make[s] it clear that we are talking about extraordinary theft, not mere competition." 142 Cong. Rec. H10460-01, H10462 (daily ed. Sept. 17, 1996) (statement of Rep. Schumer). "[W]holesale disclosure of

material likely breaches the requirement that a trade secret owner take reasonable measures to protect the information's confidentiality." 142 Cong. Rec. S12201-03, S12212 (daily ed. Oct. 2, 1996) (Managers' Statement for H.R. 3723, the Economic Espionage Bill).

> [T]he definition of a trade secret includes the provision that an owner have taken reasonable measures under the circumstances to keep the information confidential. We do not with this definition impose any requirements on companies or owners. Each owner must assess the value of the material it seeks to protect, the extent of a threat of theft, and the ease of theft in determining how extensive their protective measures should be. We anticipate that what constitutes reasonable measures in one particular field of knowledge or industry may vary significantly from what is reasonable in another field or industry. However, some common sense measures are likely to be common across the board. For example, it is only natural that an owner would restrict access to a trade secret to the people who actually need to use the information. It is only natural that an owner clearly indicate in some form or another that the information is proprietary. However, owners need not take heroic or extreme measures in order for their efforts to be reasonable.

Id. at S12213.

Similarly, under the common law of New York, which has not adopted the UTSA, "the courts require that the possessor of a trade secret take reasonable measures to protect its secrecy." Defiance Button Mach. Co. v. C&C Metal Products Corp., 759 F.2d 1053, 1063 (2d Cir. 1985) (citation omitted). "[I]t is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the

13

common-law terms it uses." DeKalb Cty. Pension Fund v. Transocean Ltd., 817 F.3d 393, 405 (2d Cir. 2016) (citation omitted). It has long been axiomatic that "[t]he subject of a trade secret must be a secret." Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 475 (1974). The Restatement (Third) of Unfair Competition defines a trade secret as "any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others." Restatement (Third) of Unfair Competition § 39 (1995).

Whether the Trade Secrets are in fact trade secrets, as that term is used in the DTSA, presents questions of fact. The defendants argue that the actuarial analysis that constitutes one component of Xavian's asserted Trade Secrets is derived from publicly available information and is in any event stale. The defendants argue that the other component -- Xavian's credit rating analysis -- is unique to Xavian and therefore of little value to others. These issues may not be resolved on a motion to dismiss.

Similarly, the parties fiercely dispute whether Xavian took the steps it needed to take to protect its Trade Secrets. Marsh points out that Xavian provided its Trade Secrets to Marsh without any NDA or similar confidentiality agreement; to Carpenter without requesting the return of the documents

14

containing the Trade Secrets (despite having a contractual right to do so) and pursuant to an agreement that imposed no surviving obligations on Carpenter to maintain confidentiality once the agreement expired; and apparently to Stone Point, pursuant to an agreement that also imposed no surviving obligation on Stone Point to maintain confidentiality. Marsh also argues that the SAC does not adequately plead that Marsh has actually used the Trade Secrets in setting up AFIC. While the SAC is far from a model of clarity, it suffices to plead a plausible claim of a violation of the DTSA.

Marsh emphasizes the decision in Structured Capital Solutions, LLC v. Commerzbank AG, 177 F. Supp. 3d 816 (S.D.N.Y. 2016), which granted summary judgment to the defendant on a misappropriation of trade secrets claim under New York law. Id. at 837. In Structured Capital, the Honorable Jed Rakoff held that the claim failed as a matter of law when the trade secret had been disclosed to a third party pursuant to an NDA with a limited term that had since expired. That document imposed no duty to continue to keep the information confidential after expiration. Id. at 835-36. Marsh may be correct that this type of disclosure, by itself, requires judgment to be entered in its favor on summary judgment. But, until the factual record is more fully developed, it is unclear whether there are additional facts that will be relevant to the assessment of whether Xavian

took "reasonable measures" to keep its Trade Secrets secret. All that can be determined now is that it has pleaded a plausible claim for violation of the DTSA.

The defendants have correctly argued, however, that Xavian has failed to make any factual allegations regarding actions taken by MMC that could plausibly constitute misappropriation of trade secrets. The SAC's sole allegations concerning MMC, which is a parent company of Marsh, are that individuals who are involved with AFIC represent themselves as employees of MMC on LinkedIn, and that an AFIC brochure appearing on a United Kingdom website displays both Marsh and MMC logos. In its opposition to this motion, Xavian also notes that MMC has filed actions to enforce its trade secrets in the Southern District of New York. This does not relieve Xavian of its burden to plead sufficient non-conclusory factual allegations to support a plausible inference that MMC is liable for the misconduct alleged. The motion to dismiss must therefore be granted with respect to MMC.

## **Conclusion**

The defendants' January 16 motion to dismiss is denied as to Marsh USA, Inc. and granted as to Marsh & McLennan Companies, Inc.

Dated: New York, New York
April 16, 2019

_____
DENISE COTE
United States District Judge